**Not for Publication**

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

———————————————————————
JAMES RUSSELL,                           :
                                         :
            Petitioner,                  :        Civ. No. 20-3478 (PGS)
                                         :
      v.                                 :
                                         :
STEPHEN JOHNSON, et al.                  :        **OPINION**
                                         :
            Respondents.                 :
———————————————————————:

## <u>PETER G. SHERIDAN, U.S.D.J.</u>

### I.  INTRODUCTION

Petitioner, James Russell ("Petitioner" or "Russell"), is a state prisoner proceeding *pro se* with an amended petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254. (ECF No. 8.) For the following reasons, the amended petition is denied and a certificate of appealability shall not issue.

### II. FACTUAL AND PROCEDURAL BACKGROUND

The background giving rise to Petitioner's judgment of conviction was summarized by the New Jersey Superior Court, Appellate Division on Petitioner's direct appeal as follows:[1]

———————————————
[1] The Appellate Division considered Petitioner's direct appeal together with the direct appeals of his codefendants, Tyleek Baker and Jamal Scott. All three individuals challenged their "convictions for the February 7, 2006, murder of Jose Francisco Olivares in a Lakewood barbershop." (ECF No. 27-1, *State v. Scott, Baker, and Russell*, Nos. A-3455-08T4, A-4794-08T4,

On June 1, 2006, the Ocean County grand jury returned Indictment No. 06–05–0869, in which all three defendants were charged with: (1) first-degree murder, N.J.S.A. 2C:11–3 (count one); and (2) first-degree conspiracy to commit murder, N.J.S.A. 2C:11–3 and 2C:5–2 (count two). Baker was charged separately with: second-degree possession of a weapon for an unlawful purpose, N.J.S.A. 2C:39–4(a) (count three); third-degree unlawful possession of a weapon, N.J.S.A. 2C:39–5(b) (count four); and second-degree possession of a firearm by certain persons, 2C:39–7(b)(1) (count five).

Daniel Thomas was also charged in counts one and two. However, Thomas entered into a pre-trial plea agreement by which he pled guilty to third-degree conspiracy to commit aggravated assault, N.J.S.A. 2C:5–2 and 2C:12–1(b), 2 and agreed to testify truthfully against defendants at trial. The State agreed to recommend a probationary sentence.

. . .

The evidence at trial revealed that at approximately 4:00 p.m. on February 7, 2006, Jason Vega arrived at the Man, Woman and Child Barbershop in Lakewood. Vega's brother, Ramon, and Vega's friends, Christian Vivar Grandados and Olivares, known as "Hefe," were already there. Jose Silva was one of the barbers at the shop that day.

Vega wanted to buy some CDs that were in a backroom of the barbershop. He walked through another room where approximately nine people were gathered, stopping briefly to say hello. Baker, who was known as "Respect," was playing chess with another person when he began "mocking" Vega. Vega ignored Baker's "mocking" until

---

A-4841-08T4, 2012 WL 1365970 (N.J. Super Ct. App. Div. April 20, 2012). To avoid confusion, this Court will short cite to the New Jersey Appellate Divisions direct appeal Opinion as *Russell*, 2012 WL 1365970.

he heard Baker say to someone on the phone, "Jason Vega and his boys are plotting on me." Not knowing to whom Baker was speaking, Vega was upset and thought he was going to "have to . . . watch[ ][his] back." Vega challenged Baker to a fight "and he accepted." Vega "asked him to step outside . . . to settle it[,] basically, fistfight." James Bellamy, a defense witness who was in the shop with his wife Nakisha at the time, claimed, however, that Baker was not involved in any arguments or confrontations.

According to Vega, after Baker accepted the challenge, Baker asked someone if Hefe was in the shop. When told he was, Baker ran out the back door. Vega waited for Baker in front of the barbershop for approximately fifteen minutes and then left.

Shortly after this confrontation, Granados saw Russell, whom he knew as "Gotti," and Scott, who was known as "High–Five," enter the barber shop and walk to the back. They stayed in the store for a couple of minutes before leaving.

Silva was arranging his barber station when he saw Baker, who he knew as a regular customer, come in with two other men. When the men entered, Olivares was seated, but, as he stood up from his chair, Baker shot him six times. Silva described the gun as gray, with a black handle, and as looking like a 9 mm. Silva could not identify the two men with Baker.

Granados was getting his hair cut when he saw Baker, Russell, and Scott walk into the shop. He heard Baker say, "Where's that n***** that have a beef with me?" Olivares stood up, said, "What's up?," and Baker shot him. Granados explained that during the shooting, Russell stood on Baker's left and Scott on his right. Both men had their hands crossed in front of them, kept a straight face, and did not appear upset or surprised.

3

Alexander Truyenque testified that around 4:30 p.m. he saw "three men walk in the barber shop and shoot somebody". The three were African–American, and the one "in the middle took out a weapon and fired several shots at the victim" who was sitting in the corner. Truyenque heard a conversation between the shooter and Olivares before the shots were fired. When shown a photographic array that included Russell's photo, Truyenque stated that the photograph "look[ed] like" one of the men who stood by the shooter.

Ramon, who was fifteen years old at the time of the shooting, similarly testified that three men entered the barbershop and one shot Olivares as the other two stood on either side. After the shooting, all three men ran from the barbershop. Ramon raced outside to see a silver four-door car, possibly a Toyota, fleeing the scene. Silva and Granados each called 9–1–1 from outside the barbershop.

When emergency responders arrived, Olivares was still alive but in grave condition. He died shortly thereafter. The autopsy revealed a total of five entrance wounds caused by bullets discharged from a gun more than twelve inches away. Six shell casings were recovered from the floor of the barbershop. All six casings "were discharged from the same firearm," a 9mm Luger.

Thomas testified that he spent the morning of the day of the shooting in Freehold with Scott, his cousin. Later in the day, Thomas received a call from Baker saying that Vega and Olivares were "trying to get at him at the barber shop". Baker asked Thomas to come to the barber shop, but Thomas went to Baker's home first. In the meantime, Thomas received a call from Russell, who said he was at the barber shop but Baker was not there.

Thomas left for the shop, thinking he "was gonna . . . fight". Thomas knew that Baker and Olivares were "beefing" but believed Baker could handle Olivares on his own. Thomas went to the barbershop "in case someone

4

from [Olivares's] group" got involved. When Thomas arrived, he saw Vega leaving and a silver Toyota Corolla parked outside. As he entered, Thomas saw that one of the barbers looked scared. Thomas "looked over to the corner . . . and . . . [saw] Respect, Gotti and High–Five. And then Respect started . . . shooting into the . . . corner." Thomas ran out of the barber shop.

As Thomas left, Baker called and asked where he was going. Thomas looked back and saw Baker holding the gun and all three defendants gathered around the Corolla. Thomas ran to a nearby restaurant where he met a friend who drove Thomas to his cousin's house in Freehold.

About twenty-five minutes later, Thomas received a call from Baker. Baker asked Thomas to come and get the gun, but Thomas refused. While still on the phone, the three defendants and a "Mexican dude from the barber shop" arrived in the Corolla, with Russell driving. Thomas asked Baker: "[W]hat the fuck happened and shit? And he was, like, man, I deaded the nigger. You know what I mean? . . . He said he deaded him, smoked him. . . . Killed him. Hefe and shit." Baker told Thomas that he needed to "get out of [t]here," shook his hand, and left. Thomas later learned from Russell that he drove Baker to Baltimore.

Robert Schillaci testified that on the day of the shooting, Russell called him at 7:00 a.m. and asked him to rent a car because Russell did not have a credit card. Schillaci went to Just Four Wheels in Lakewood, where he rented a silver Toyota Corolla, drove it to Russell at a housing complex and left the car with him. The next day, Russell called Schillaci and "said the car was too small. He wanted to get another one." Schillaci picked up the Corolla, returned it to Just Four Wheels and rented a white Toyota Camry for Russell.

Yehuda Dubovick, the manager of Just Four Wheels, testified that the Corolla had been driven a total of 381 miles between February 7 and February 8. When it was

returned, his employees cleaned and vacuumed the car. Nonetheless, investigators found cigar tubes in the front passenger door compartment of the Corolla and were able to lift a fingerprint from one of them. The print was a positive match to Scott. Another print lifted from the driver's side door positively matched Russell.

*Russell*, 2012 WL 1365970 at * 3-5.

Petitioner was tried jointly with codefendants Tyleek Baker and Jamal Scott and following a jury trial was convicted of first-degree murder and first-degree conspiracy to commit murder. On December 17, 2008, after merging the conspiracy count into the first-degree murder count for sentencing purposes, the trial court sentenced Petitioner to a term of life imprisonment subject to the No Early Release Act ("NERA"), N.J.S.A. 2C:43-7.2. (*See* ECF No. 26-4; *State v. Russell*, No. A-5319-15T2, 2019 WL 2114762 at * 2 (N.J. Super Ct. App. Div. May 15, 2019).)

Petitioner filed a direct appeal. The Appellate Division affirmed the judgment of conviction on April 20, 2012. *Russel*, 2012 WL 1365970. The New Jersey Supreme Court denied certification on Petitioner's direct appeal. (ECF No. 27-2, *State v. Russell*, 54 A.3d 810 (N.J. 2012).)

Petitioner filed a post-conviction relief ("PCR") petition. On April 29, 2016, the PCR court denied his petition. (*See* ECF No. 27-6.) Petitioner appealed, and the Appellate Division affirmed the denial on May 15, 2019. *Russell*, No. A-5319-15T2, 2019 WL 2114762. The New Jersey Supreme Court then denied Petitioner's petition for certification. (ECF No. 29-4.)

Petitioner filed the instant habeas petition on February 7, 2020. (ECF No. 8.) Respondents filed an answer. (ECF No. 17.)

## III.  LEGAL STANDARD

Under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), 28 U.S.C. § 2254 provides, the district court "shall entertain an application for writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." Habeas petitioners bear the burden of establishing their entitlement to relief for each claim presented in a petition based upon the record that was before the state court. *See Eley v. Erickson*, 712 F.3d 837, 846 (3d Cir. 2013). District courts are required to give great deference to the determinations of the state trial and appellate courts. *Renico v. Lett*, 559 U.S. 766, 772–73 (2010).

Where a claim has been adjudicated on the merits by the state courts, the district court shall not grant an application for writ of habeas corpus unless the state court adjudication:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States: or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

7

28 U.S.C. § 2254(d).

"Contrary to clearly established Federal law" means the state court applied a rule that contradicted the governing law set forth in U.S. Supreme Court precedent or that the state court confronted a set of facts that were materially indistinguishable from U.S. Supreme Court precedent and arrived at a different result than the Supreme Court. *Eley*, 712 F.3d at 846 (*citing Williams v. Taylor*, 529 U.S. 362, 405-06 (2000)). Federal law is clearly established for these purposes where it is clearly expressed in "only the holdings, as opposed to the dicta" of the opinions of the United States Supreme Court. *See Woods v. Donald*, 575 U.S. 312, 316 (2015). An "unreasonable application" of clearly established federal law is an "objectively unreasonable" application of law, not merely an erroneous application. *Eley*, 712 F.3d at 846 (*quoting Renico*, 559 U.S. at 773). As to 28 U.S.C. § 2254(d)(1), a federal court must confine its examination to evidence in the record. *Cullen v. Pinholster*, 563 U.S. 170, 180–81 (2011).

"When reviewing state criminal convictions on collateral review, federal judges are required to afford state courts due respect by overturning their decisions only when there could be no reasonable dispute that they were wrong." *Woods*, 574 U.S. at 316. Where a petitioner challenges an allegedly erroneous factual determination of the state courts, "a determination of a factual issue made by a State court shall be presumed to be correct [and t]he applicant shall have the burden of

rebutting the presumption of correctness by clear and convincing evidence. 28 U.S.C. § 2254(e)(1). Furthermore, "[w]hen a state court arrives at a factual finding based on credibility determinations, the habeas court must determine whether that credibility determination was unreasonable." *See Keith v. Pennsylvania*, 484 F. App'x 694, 697 (3d Cir. 2012) (citing *Rice v. Collins*, 546 U.S. 333, 339 (2006)).

Finally, to the extent that a petitioner's constitutional claims are unexhausted and/or procedurally defaulted, a court can nevertheless deny them on the merits under 28 U.S.C. § 2254(b)(2). *See Taylor v. Horn*, 504 F.3d 416, 427 (3d Cir. 2007) ("Here, because we will deny all of [petitioner's] claims on the merits, we need not address exhaustion"); *Bronshtein v. Horn*, 404 F.3d 700, 728 (3d Cir. 2005) (considering procedurally defaulted claim, and stating that "[u]nder 28 U.S.C. § 2254(b)(2), we may reject claims on the merits even though they were not properly exhausted, and we take that approach here").

## IV. DISCUSSION

### A. Ground One

In Ground One, Petitioner argues that eyewitnesses Christian Viva Granados's and Alexander Truyunque's photographic identifications of Petitioner were impermissibly suggestive. (ECF No. 8 at 6-7.) Petitioner contends that Lakewood Detective Gregory Staffordsmith showed both witnesses photo arrays that (1) contained the same six photographs in the same order with Petitioner's photo

included as photo number 5 in each array and (2) contained a photograph of Petitioner that caused his likeness to appear larger than all but one of the other photographs used. Petitioner argues that Truyunque did not appear to be certain of his identification of Petitioner and Granados was familiar with Petitioner prior to the crime and could have been influenced by the size of Petitioner's likeness in the photo array. On direct appeal, the Appellate Division denied this claim as meritless for the following reasons:

> Greg Staffordsmith, the lead detective on the case from the Lakewood police department, testified at the *Wade*[2] hearing that he compiled the photo arrays which were shown to the witnesses, but other officers conducted the actual procedures. Staffordsmith searched for other photos to include in the array by using a database which allowed him to locate individuals who shared similar characteristics with defendants.
>
> . . . All of the officers chosen to administer the arrays utilized the same procedure in conducting the out-of-court identification with each witness, covering the names and numbers under each picture, placing one photo at a time in front of the witness, continuing through the photos even after an identification was made and confirming the identification, often with a second viewing of the array. All of the officers who testified at the *Wade* hearing denied doing anything to suggest to the witnesses which photo to choose.
>
> . . .
>
> [Petitioner's] photo was in the fifth position, and Staffordsmith acknowledged that [Petitioner's] face

---

[2] *United States v. Wade*, 388 U.S. 218 (1967).

appeared larger in his photo than did the faces in three of the other five photos in the array. Granados identified [Petitioner's] photo by saying, "He was there, he was one of them". Truyenque was less certain, saying only, "It looks like him".

In his written decision, the judge concluded that "the format of the photographs in the array and the procedure used . . . were in accordance with New Jersey laws and guidelines." With respect to the size differences between the photographs included in [Petitioner's] arrays, the judge concluded that "slight alteration[s] in picture size . . . are not impermissibly suggestive". The judge also noted that in *State v. Delgado*, 188 N.J. 48, 63 (2006), the Court determined that law enforcement officers are now required "to make and maintain a written record detailing the identification procedure". However, the judge observed that *Delgado* was decided five months after the murder, and that the police compiled a sufficient written record of the procedures utilized which did "not indicate any impermissible suggestiveness." With respect to the location of the [Petitioner's] photos in the arrays, the judge stated:

> Arguably, the alleged [Petitioner's] picture should be in a different space every time the line up is presented to a witness in order to diminish any impermissible suggestiveness, however, since each witness viewed the photo arrays individually there is no indication of impermissible suggestiveness because no witness knew of another witness['s] choice of photograph.

Before us, [Petitioner] contend[s] the procedures were impermissibly suggestive for the same reasons they advanced in the trial court. . . . [Petitioner] argues that the procedures as to him were impermissibly suggestive because of the size of the photo used which was also kept in the same position.

11

> These arguments lack sufficient merit to warrant discussion in this written opinion. R. 2:11–3(e)(2). We affirm substantially for the reasons expressed by the trial judge in his written opinion.

*Russell*, 2012 WL 1365970 at * 6-7.

The Supreme Court's decisions in *Neil v. Biggers*, 409 U.S. 188 (1972), and *Manson v. Brathwaite*, 432 U.S. 98 (1977), set forth the standard for when the Due Process Clause requires suppression of an eyewitness identification tainted by police arrangement. The Supreme Court emphasized, first, that due process concerns arise only when law enforcement officers use an identification procedure that is both suggestive and unnecessary. *Id.*, at 107; *Biggers*, 409 U.S. at 198. Crucially, "[e]ven when the police use such a procedure, the Court next said, suppression of the resulting identification is not the inevitable consequence." *Perry v. New Hampshire*, 565 U.S. 228, 239 (2012) (citing *Brathwaite*, 432 U.S., at 112–113; *Biggers*, 409 U.S. at 198–199).

The Court held that exclusion was not compelled without consideration of reliability of the identification, considering factors laid out in *Neil*, including:

> the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of his prior description of the criminal, the level of certainty demonstrated at the confrontation, and the time between the crime and the confrontation. Against these factors is to be weighed the corrupting effect of the suggestive identification itself.

12

*Brathwaite*, 432 U.S. at 114. Ultimately, a court must determine whether "under all the circumstances of th[e] case there is 'a very substantial likelihood of irreparable misidentification.'" *Id.* at 116 (quoting *Simmons v. U.S.*, 390 U.S. 377, 384 (1968)).

Here, the Appellate Division did not unreasonably apply clearly established federal law when it rejected Plaintiff's identification claim.[3] The Appellate Division denied Petitioner's claim, affirming the trial court's decision for substantially the same reasons expressed by the trial court. The trial court explained:

> "Our Court has consistently followed the United States Supreme Court's analysis in determining the admissibility of out-of-court and in-court identifications. *State v. Herrera*, 187 N.J. 493 (2006) quoting *State v. Madison*, 109 N.J. 223, 233 (1988)). Until the New Jersey Supreme court is "convinced that a different approach is required after a proper record has been made in the trial court, we continue to follow the Supreme Court's approach. *Id.* at 504. The two step approach consists of:
>
> 1. "whether the [identification] procedure . . . was impermissibly suggestive" and
>
> 2. If the procedure was impermissibly suggestive was it "nevertheless sufficiently reliable to warrant the admissibility of the identification by the [witness]." *Id.* at 504, 506.
>
> In order to determine whether the photographic line-up procedure conducted by the police is impermissibly suggestive the court must determine "by the totality of the circumstances of the identification [procedure] . . . that the

---

[3] *See State v. Madison*, 109 N.J. 223, 232–33 (1988) (adopting the standard for reviewing identification evidence set forth in *Manson v. Brathwaite*, 432 U.S. 98, 110 (1977)).

> identification was not actually that of the eyewitness, but was imposed upon him so that a substantial likelihood of irreparable misidentification can be said to exist." [*Madison*, 109 N.J. 223.]

(ECF No. 26-6 at 24.) The trial court reviewed the photo arrays that were presented to Granados and Truyunque. (ECF No. 19 at 11-12.)

The Appellate Division affirmed the trial court's decision that the "slight" difference in the size of the photograph of Petitioner was not impermissibly suggestive. Additionally, the Appellate Division affirmed the trial court's finding that the placement of Petitioner's photograph in spot number five of each photo array was not impermissibly suggestive because Granados and Truyunque viewed the photo arrays individually and neither witness knew which photograph the other choose. The Appellate Divisions decision was not contrary to or an unreasonable application of federal law.

Petitioner also fails to establish that state court decision involved an unreasonable determination of the facts. Findings of fact made by the state court are presumed correct unless rebutted by clear and convincing evidence. 28 U.S.C. § 2254(e)(1). Here, the state court reviewed the photo array and found only a slight difference between the individual photos in the array. Petitioner has failed to present clear and convincing evidence to the contrary. As such, Ground One is dismissed as meritless.

**B. Ground Two**

14

In Ground Two, Petitioner argues that his constitutional right to a fair trial was violated by the state's exercise of a peremptory challenge on constitutionally impermissible grounds to strike an African-American juror from the jury.

On direct appeal, the Appellate Division denied this claim as meritless, explaining as follows:

> Peremptory challenges may not be used to exclude jurors solely for a racially discriminatory reason. *Batson v. Kentucky*, 476 U.S. 79, 89, 106 S.Ct. 1712, 1719, 90 L. Ed.2d 69, 82–83 (1986); *State v. Gilmore*, 103 N.J. 508, 529 (1986). "[T]he ultimate burden of persuading the trial court that the prosecution exercised its peremptory challenges on constitutionally-impermissible grounds remains at all times with the defendant." *Gilmore*, *supra*, 103 N.J. at 534. The prosecution is entitled to a rebuttable presumption that the challenges were exercised in a constitutionally-permissible fashion. *Id.* at 534–35.
>
> As the Court explained in *State v. Osorio*, 199 N.J. 486, 492 (2009), a defendant asserting such a claim must "tender sufficient proofs to raise an inference of discrimination." Where a prima facie showing is made, "[t]he burden shifts to the prosecution to come forward with evidence that the peremptory challenge[ ] under review [is] justifiable on the basis of concerns about situation-specific bias." *Gilmore*, *supra*, 103 N.J. at 537. Finally, the trial court must examine the defendant's prima facie showing in light of the prosecution's rebuttal "to determine whether the defendant has carried the ultimate burden of proving, by a preponderance of the evidence, that the prosecution exercised its peremptory challenges on constitutionally-impermissible grounds of presumed group bias." *Id.* at 539.
>
> Here, prior to exercising a peremptory challenge to remove juror number ten, an African–American woman,

15

the prosecutor requested a sidebar to place his reasons on the record in order to "dispel any notions of racism". He explained that the juror was young and not particularly responsive during the voir dire. The prosecutor additionally observed the juror making prolonged eye contact with defendant Scott. All three defendants objected.

The judge noted there were "three, possibly four" African–American jurors in the venire, and "three had reasons . . . they could not serve. . . ." He found that the State was not removing juror ten "based on any race and there's no pattern established." The judge permitted the exercise of the challenge and juror ten was excused.

Defendants argue the State's use of a peremptory challenge to excuse juror ten was not based upon any "case-specific, race-neutral reason." We find the arguments to lack sufficient merit to warrant extensive discussion. R. 2:11–3(e)(2). In short, defendants failed to "tender sufficient proofs to raise an inference of discrimination." *Osorio*, *supra*, 199 N.J. at 492.

*Russell*, 2012 WL 1365970 at * 7-8.

The Supreme Court in *Batson v. Kentucky*, 476 U.S. 79 (1986) set forth a three-step inquiry to determine the constitutionality of a peremptory strike. First, "the trial court must determine whether the defendant has made a prima facie showing that the prosecutor exercised a peremptory challenge on the basis of race." *Rice v. Collins*, 546 U.S. 333, 338 (2006). If this showing is made, then "the burden shifts to the prosecutor to present a race-neutral explanation for striking the juror in question." *Id.* "Third, the court must then determine whether the defendant has carried his burden of proving purposeful discrimination." *Id.* The court must

evaluate "the persuasiveness of the justification" offered by the prosecutor, but "the

ultimate burden of persuasiveness regarding racial motivation rests with, and never

shifts from, the opponent of the strike." *Id.* The Supreme Court explained the trial

court's role at step three of the *Batson* inquiry:

> The trial court has a pivotal role in evaluating *Batson*
> claims. Step three of the *Batson* inquiry involves an
> evaluation of the prosecutor's credibility, *see* 476 U.S., at
> 98, n. 21, 106 S. Ct. 1712, and "the best evidence [of
> discriminatory intent] often will be the demeanor of the
> attorney who exercises the challenge," *Hernandez*, 500
> U.S., at 365, 111 S. Ct. 1859 (plurality opinion). In
> addition, race-neutral reasons for peremptory challenges
> often involve a juror's demeanor (e.g., nervousness,
> inattention), making the trial court's firsthand
> observations of even greater importance. In this situation,
> the trial court must evaluate not only whether the
> prosecutor's demeanor belies a discriminatory intent, but
> also whether the juror's demeanor can credibly be said to
> have exhibited the basis for the strike attributed to the juror
> by the prosecutor. We have recognized that these
> determinations of credibility and demeanor lie
> "'peculiarly within a trial judge's province,'" *ibid.*
> (*quoting Wainwright v. Witt*, 469 U.S. 412, 428, 105 S. Ct.
> 844, 83 L. Ed. 2d 841 (1985)), and we have stated that "in
> the absence of exceptional circumstances, we would defer
> to [the trial court]," 500 U.S. at 366, 111 S. Ct. 1859
> (plurality opinion).

*Snyder v. Louisiana*, 552 U.S. 472, 477 (2008).

Here, this Court has reviewed the transcripts and finds that the trial court

appropriately applied *Batson* to the juror at issue. The trial court heard arguments

from Petitioner and heard the prosecutor's race-neutral reasons for exercising his

peremptory challenges. (ECF No. 21-3 at 102:3 to 111:5.) The trial court considered all of the relevant circumstances and explained that the court found the state was not removing the juror based on race and there was no pattern established. (*Id.* at 111:8-22.) The trial court then stated that the state was permitted to exercise the peremptory challenge. (*Id.* at 11:22-24.)

Petitioner has failed to demonstrate that the state court's decision to deny Petitioner's *Batson* claim was contrary to, or an unreasonable application of *Batson* or that it based its decision on an unreasonable determination of the facts. Petitioner is not entitled to habeas relief on Ground Two.

### C. Ground Three

In his third ground for relief, Petitioner argues that his verdicts of murder, based on accomplice liability, and conspiracy to commit murder were against the weight of the evidence. (ECF No. 10-11.) Petitioner argues that there was "insufficient evidence produced to establish that [Petitioner] shared the shooter's state of mind nor was there sufficient evidence that [Petitioner] conspired with Baker or anyone else to bring about the murder of Francisco Olivares." (*Id.* at 11.) Petitioner submits that defense counsel made a motion for judgment of acquittal at the end of the state's case and a motion for a new trial. (*Id.* at 10.)

On direct appeal, the Appellate Division found this claim meritless, explaining the following:

A [motion for judgment notwithstanding the verdict (JNOV)] is governed by Rule 3:18–2, and "[t]he standard for resolving a motion brought under [that] rule is the same" as that governing a motion seeking a judgment of acquittal under Rule 3:18–1. *State v. Tindell*, 417 N.J.Super. 530, 549 (App.Div.2011). We conduct our review de novo, applying the same standard used by the trial judge, *State v. Bunch*, 180 N.J. 534, 548–49 (2004), namely:

> [W]hether, viewing the State's evidence in its entirety, be that evidence direct or circumstantial, and giving the State the benefit of its favorable testimony as well as of the favorable inferences which reasonably could be drawn therefrom, a reasonable jury could find guilt of the charge beyond a reasonable doubt.

[*State v. Josephs*, 174 N.J. 44, 80 (2002) (quoting *State v. Reyes*, 50 N.J. 454, 459 (1967) (parallel citations omitted).]

A motion for a new trial is subject to the discretion of the trial judge. *State v. Russo*, 333 N.J.Super. 119, 137 (App.Div.2000). Therefore, on appeal,

> Our scope of review is limited to a determination of "whether the findings made by the trial court could reasonably have been reached on sufficient credible evidence present in the record." Moreover, we will "give deference to the trial judge's feel for the case since he presided over [it] . . . and had the opportunity to observe and hear the witnesses as they testified."

[*State v. Brooks*, 366 N.J.Super. 447, 454 (App.Div.2004) (alteration in original) (quoting *Russo*, *supra*, 333 N.J.Super. at 137).]

The trial judge's ruling on a motion for a new trial based upon insufficient evidence "shall not be reversed unless it clearly

appears that there was a miscarriage of justice under the law." R. 2:10–1.

To be guilty as an accomplice, a defendant must "act with a purposeful state of mind in furtherance of the crime." *State v. Whitaker*, 200 N.J. 444, 457 (2009). Knowledge alone "does not make one an accomplice." *Id.* at 458. The defendant "must not only share the same intent as the principal who commits the crime, but also must 'at least indirectly participate[ ] in the commission of the criminal act.'" *Id.* at 459 (alteration in original) (quoting *State v. Bielkiewicz*, 267 N.J.Super. 520, 528 (App.Div.1993)).

"[T]he agreement to commit a specific crime is at the heart of a conspiracy charge." *State v. Samuels*, 189 N.J. 236, 245 (2007). "[M]ere knowledge, acquiescence, or approval of the substantive offense, without an agreement to cooperate, is not enough to establish one as a participant in a conspiracy." *State v. Abrams*, 256 N.J.Super. 390, 401 (App.Div.), certif. denied, 130 N.J. 395 (1992). In other words, "[t]here must be intentional participation in the activity with a goal of furthering the common purpose." *Ibid.* However, "[b]ecause the conduct and words of co-conspirators [are] generally shrouded in 'silence, furtiveness and secrecy,' the conspiracy may be proven circumstantially." *Samuels*, *supra*, 189 N.J. at 246 (quoting *State v. Phelps*, 96 N.J. 500, 509 (1984)).

In this case, we reject [Petitioner's and his co-defendant's] contentions that the evidence was insufficient to find beyond a reasonable doubt that they conspired with Baker to kill Olivares and acted as his accomplices. [Petitioner] was not simply present at the barber shop when the murder occurred. After Baker and Vega had a confrontation, Baker left the barber shop. [Petitioner] and Scott entered the shop shortly before the murder, left, and re-entered with Baker. Vega testified that he believed Baker left intending to return with others for support. As Baker killed Olivares, [Petitioner] and Scott stood by his side, acting in a way that implied their foreknowledge of Baker's intention.

> After the murder, [Petitioner] drove Baker and Scott to
> Freehold in a car Schillaci rented for the day at [Petitioner's]
> request. On the day after the homicide, [Petitioner] had
> Schillaci returned the car for another. Scott fled to Las Vegas
> with Baker knowing that he was wanted for murder.
>
> In short, the evidence was sufficient to find both [Petitioner]
> and Scott guilty beyond a reasonable doubt of conspiracy to
> commit murder and murder as accomplices of Baker. The
> judge did not err in denying their motions for JNOV and for
> a new trial.

*Russell*, 2012 WL 1365970 at * 15-16.

In reviewing claims that trial evidence was insufficient for a conviction, habeas courts ask whether, after viewing the evidence in the light most favorable to the prosecution, "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). This standard gives due regard to the factfinder's ability to view the evidence, resolve conflicts in it, and draw reasonable inferences from it. *Ibid.* The reviewing court does not re-weigh the evidence or re-determine the credibility of witnesses whose demeanor the factfinder has observed. *Marshall v. Lonberger*, 459 U.S. 422, 434 (1983). Determination of witness credibility is within the factfinder's sole province and is not subject to review. *Virgin Islands v. Isaac*, 50 F.3d 1175, 1179 (3d Cir. 1995); *United States v. Pelullo*, 964 F.2d 193, 218 (3d Cir. 1992). The habeas court does not substitute its judgment for the factfinder's. *See*, *e.g.*, *Weeks v. Scott*, 55 F.3d 1059, 1061 (5th Cir. 1995).

New Jersey law is consistent with these principles as to review of acquittal motion rulings. *See*, *e.g.*, *State v. Valdez*, No. A-2708-14T3, 2017 WL 3318303, at *3 (N.J. Super. Ct. App. Div. Aug. 4, 2017) (when considering a motion for judgment of acquittal, the trial court is to determine "whether, viewing the State's evidence in its entirety, be that evidence direct or circumstantial, and giving the State the benefit of all its favorable testimony as well as all of the favorable inferences which reasonably could be drawn therefrom, a reasonable [factfinder] could find guilt of the charge beyond a reasonable doubt"); *State v. Samuels*, 914 A.2d 1250, 1254 (N.J. Jan. 31, 2007) (internal citations omitted). The court must view the evidence most favorably to the state, and ought not be concerned with the weight of the evidence. *See*, *e.g.*, *Reyes*, 236 A.2d at 388.

At trial, Christian Vivar Granados testified that he saw Petitioner enter the barbershop with co-defendant Scott shortly before the murder, where he walked from the front to the back of the shop, and then exited the barbershop. (ECF No. 24-3 at 16:4 to 17:4.) Granados testified that he saw Petitioner reenter the barbershop a short time later with co-defendant Scott and co-defendant Baker. (*Id.* at 17:5-14.) Petitioner was then seen standing next to co-defendant Baker while Baker said, "where's that nigger that have a beef with me?" and started shooting at Jose Francisco Olivares. (*Id.* at 17:15 to 18:16.) Granados further testified that Petitioner

22

stood next to co-defendant Baker expressionless, with a straight face, while Baker shot Olivares. (*Id.* at 18:21 to 19:20.)

Daniel Thomas testified at trial that after the shooting, Petitioner drove co-defendants Baker and Scott to Freehold, New Jersey, where Baker attempted to get Thomas to take the murder weapon for him. (ECF No. 25 at 127:13 to 129:25.) Thomas testified that Petitioner told him that after leaving Freehold, Petitioner drove Baker to Baltimore. (*Id.* at 131:9-18.) Robert Schillaci testified that the day after the shooting Petitioner called him and asked him to trade in the rental car Petitioner was driving for a bigger car. (*Id.* at 10:2 to 10:25.) Viewing the trial evidence in a light most favorable to the state, a reasonable factfinder could find Petitioner guilty beyond a reasonable doubt of accomplice murder and conspiracy.

The Appellate Division's decision was not contrary to or an unreasonable application of relevant United States Supreme Court precedent. *See Jackson*, 443 U.S. 307. It was objectively reasonable for the state courts to find sufficient evidence to support accomplice murder and conspiracy charges against Petitioner. *See Coleman v. Johnson*, 566 U.S. 650, 651 (2012) (per curiam) (quoting *Cavazos v. Smith*, 565 U.S. 1 (2011) (per curiam) (a federal habeas court may overturn a state court's rejection of a sufficiency of the evidence challenge only if that decision was "objectively unreasonable") (quoting *Renico v. Reginald*, 559 U.S. 766, 773 (2010)). As such, the Court will deny habeas relief on Ground Three.

### D.  Ground Four

In Ground Four, Petitioner argues that the trial court erred in admitting improper opinion testimony. (ECF No. 8 at 12-13.) Petitioner claims that eyewitness Grandados' testimony regarding Petitioner's facial expression during the shooting was improperly admitted opinion testimony. (*Id.*)

As an initial matter, Petitioner's argument is ground in state evidentiary rules. "Petitions alleging specific errors in state law do not present federally cognizable issues unless the violation is demonstrated to be of constitutional magnitude." *Quintana v. Adm'r*, No. CV 13-7135, 2017 WL 4329736, at *18 (D.N.J. Sept. 29, 2017) (citing *Pulley v. Harris*, 465 U.S. 37, 41 (1984) ("A federal court may not issue the writ on the basis of a perceived error of state law")). A federal court must defer to a state court's interpretation of its own rules of evidence and procedure. *Bisaccia v. Attorney General of New Jersey*, 623 F.2d. 307, 312 (3rd Cir.1980).

Federal standards enter into the analysis, however, when an alleged evidentiary error rises to the constitutional level. "Only when an evidentiary error deprives a [Petitioner] of 'fundamental fairness' in his criminal trial is the error considered to be of constitutional proportion and cognizable in federal habeas corpus proceedings." *Bartholomay v. Beyer*, No. 91-5176, 1992 WL 184360, at *3 (D.N.J. July 13, 1992) (citing *Donnelly v. DeChristoforo*, 416 U.S. 637, 642–43 (1974) ("This is not a case in which the State has denied a [Petitioner] the benefit of a

specific provision of the Bill of Rights, such as the right to counsel, or in which the prosecutor's remarks so prejudiced a specific right, such as the privilege against compulsory self-incrimination, as to amount to a denial of that right.") (internal citations omitted)). To permit habeas relief, a state court's evidentiary decision must have been so arbitrary or prejudicial that it rendered the trial fundamentally unfair. *See Romano v. Oklahoma*, 512 U.S. 1, 12–13 (1994); *see also Keller v. Larkins*, 251 F.3d 408, 413 (3d Cir. 2001) (evidentiary error rises to the level of a Due Process violation only when "it was of such magnitude as to undermine the fundamental fairness of the entire trial").

There is no indication that the trial court's decision to permit the testimony of Granados regarding Petitioner's facial expression during the shooting rendered Petitioner's trial fundamentally unfair. At trial, Granados testified as follows:

Q.   Where were [Petitioner] and Scott when [Baker] shot your friend?

A.   They were next to him. One was on the left side, which is [Petitioner] and on the right-hand side was [Scott].

Q.   What did they do - - show the jury what they did when the shooting started?

A.   They came and they just stood like this on each side of him.

Q.   Did their facial expressions - - let me ask a better question. Did [Petitioner's] facial expression change?

Mr. Washington: Objection, leading.

25

The Court: I'm going to allow it. Overruled.

Q.  Did [Petitioner's] facial expression change between before the shooting and when the bullets were fired?

A.  No, it did not. He just kept a straight face.

Q.  Did [Petitioner] appear surprised?

A.  No, he did not.

Mr. Washburn: Objection.

The Court: I'll allow it. Overruled.

Q.  Did [Petitioner] appear surprised when [Baker] started shooting [Olivares]?

A.  No, he did not. He just stood there.

Q.  Did  he appear upset when [Baker] started shooting?

Mr. Washburne: Objection.

The Court: Overruled. You can answer.

A.  No, he did not.

(ECF No. 24-3 at 18:13 to 19:20.)

Petitioner raised this claim on direct appeal and the Appellate Division denied

the claim for the following reasons:

> "The admissibility of opinion evidence rests within the discretion of the trial court," and is reviewed for abuse of discretion. [State v. LaBrutto, 114 N.J. 187, 197 207 (1989)]. A lay witness may opine as to matters arising from common knowledge or observation. State v. Bealor, 187 N.J. 574, 586 (2006). In accordance with N.J.R.E. 701, a lay witness's

> "testimony in the form of opinions or inferences may be
> admitted if it (a) is rationally based on the perception of the
> witness and (b) will assist in understanding the witness'
> testimony or in determining a fact in issue." However, it is
> required that the "witness . . . have actual knowledge,
> acquired through his or her senses, of the matter to which he
> or she testifies." *LaBrutto*, supra, 114 N.J. at 197.
>
> Here, Granados made personal observations at the time of the
> shooting upon which he based his opinion that neither
> [Petitioner or Scott] appeared surprised or upset when Baker
> fired. Contrary to [Petitioner's] assertions, Granados need not
> have known [Petitioner] beforehand to form such an opinion.
> Moreover, [Petitioner's] and Scott's appearance was relevant
> to a "fact in issue," N.J.R.E. 701(b), that is, whether they were
> accomplices of Baker or merely present at the shooting.

*Russell*, 2012 WL 1365970 at *12.

The state court's decision was not an unreasonable application of clearly established federal law. Here, Petitioner has not raised a valid constitutional violation, and to the extent that he challenges the state court's application of state law, his claim fails. As explained above, state-court evidentiary rulings are not a basis for habeas relief unless the asserted error rises to the level of a federal constitutional violation. *See Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991); *see also Lewis v. Jeffers*, 497 U.S. 764, 780 (1990) ("federal habeas corpus relief does not lie for errors of state law"). He has not established how the evidence of Granados opinion regarding Petitioner's facial expression, within the context of the case, violated his right to a fair trial.

Here, the relevant rules of evidence governing opinion testimony of lay witnesses permit a witness who is not testifying as an expert to testify to an opinion that is "rationally based on the witness's perception". *See* F.R.E. 701.[4] Granados testified that he witnessed Petitioner while Petitioner stood next to Baker for the duration of the shooting. The Appellate Division explained the Granados opinion testimony was based on his personal observation and was relevant to whether Petitioner was an accomplice in the shooting or merely a bystander. Petitioner has failed to show any error or unfairness, let alone a due process violation. *Riggins v. Nevada*, 504 U.S. 127, 149 (1992).  Therefore, Petitioner's fourth ground for relief is denied.

### E.  Ground Five

Petitioner's fifth ground for habeas relief alleges two separate claims regarding the trial court's denials of Petitioner's requests for a mistrial. First, Petitioner argues that the trial court erred in denying his mistrial requests based on the state's pattern of providing untimely discovery. (ECF No. 8 at 14-16.) Petitioner alleges that the state failed to inform him that Daniel Thomas changed his prior

---

[4] *See* F.R.E. 701 ("If a witness is not testifying as an expert, testimony in the form of an opinion is limited to one that is: (a) rationally based on the witness's perception; (b) helpful to clearly understanding the witness's testimony or to determining a fact in issue; and (c) not based on scientific, technical, or other specialized knowledge within the scope of Rule 702 [(governing expert witness testimony)]"); N.J.R.E. 701 ("If a witness is not testifying as an expert, the witness' testimony in the form of opinions or inferences may be admitted if it: (a) is rationally based on the witnesses' perception and (b) will assist in understanding the witness' testimony or determining a fact in issue.").

statement until the day of his testimony and that it failed to provide proper notice that Granados, Truyenque, and Jose Silva also changed their statements. (*Id.*) Second, Petitioner alleges that the trial court erred in denying his mistrial request based on (1) comments during the prosecutor's opening that statement, (2) comments during Thomas's testimony regarding retaliation, and (3) excusal of a member of the jury. (*Id.*)

### 1. *Untimely Discovery*

The Appellate Division considered Petitioner's claim regarding the state's alleged pattern of providing untimely discovery and denied the claim finding:

> These arguments lack sufficient merit to warrant discussion in this opinion. R. 2:11–3(e)(2). We add only the following. Thomas testified on October 28, 2008. On October 17, when the State became aware that Thomas had now identified Baker as the shooter, it recorded a new videotaped statement and supplemental investigative report which was faxed to all defense counsel. On the following Monday, DVD copies of Thomas's statement were provided to defense counsel. Prior to permitting Thomas to testify, the judge conducted a Rule 104 hearing out of the jury's presence at defense counsel's request. Defendants were fully able to cross-examine Thomas during this hearing. They were not prejudiced. *See State v. Bellamy*, 329 N.J.Super. 371, 376 (App.Div.2000) (noting the discovery rules exist because a "defendant is entitled to know the State's case against him within reasonable time to permit the preparation of a defense").
>
> As to Granados and Truyenque, one month before they testified, the prosecutor provided information regarding changes from their original statements. The alleged inconsistency between Silva's prior statement and his testimony at trial arose during direct examination, and the

> prosecutor represented he was unaware of it until the testimony was actually received. Defendants were fully able to prepare their defenses and were not prejudiced by any of these events.

*Russell*, 2012 WL 1365970 at *13.

Under *Brady v. Maryland*, the prosecution has a duty to turn over evidence favorable to the accused where the evidence is material to either guilt or punishment, 373 U.S. 83, 87 (1963), including evidence that would serve to impeach the credibility of a witness, *Wilson v. Beard*, 589 F.3d 651, 659 (3d Cir. 2009). This rule requires disclosure of information actually known to the prosecution and "all information in the possession of the prosecutor's office, the police, and others acting on behalf of the prosecution." *Wilson*, 589 F.3d at 659. To constitute a *Brady* violation, the undisclosed evidence must meet three criteria: "'The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued.'" *Banks v. Dretke*, 540 U.S. 668, 691 (2004) (quoting *Strickler v. Greene*, 527 U.S. 263, 281-82 (1999)). In other words, a verdict will be overturned for a *Brady* violation only if the petitioner can establish both "that evidence in the possession of the government was actually suppressed, and . . . that the suppressed evidence was material." *Slutzker v. Johnson*, 393 F.3d 373, 386 (3d Cir. 2004).

Petitioner has not established that the Appellate Division's rejection of this claim was contrary to or involved an unreasonable application of clearly established federal law, or that it was based on an unreasonable determination of the facts in light of the evidence presented. The Appellate Division found that the state did not withhold information, instead it turned over the information regarding the changes in Thomas, Granados and Truyenque testimonies when the state became aware of the changes and the state was not aware of the changes in Silva's testimony until he testified at trial. Additionally, the Appellate Division found that Petitioner could not show prejudice because he had the opportunity to cross-examine the witnesses regarding their changes in testimony. Accordingly, habeas relief on this claim will be denied.

2. *Comments by the Prosecutor and Witness Thomas and Juror Removal*

The Appellate Division considered Petitioner's claim regarding the prosecutor's and Thomas' comments about retaliation and the removal of juror number 16 and denied the claim finding:

> In his opening statement, the prosecutor stated:
>
> > Witnesses are human beings. I don't apologize for them, we don't choose witnesses, we don't script our cases out, trial is not an exact science, and our witnesses, most of the time, do not choose to be witnesses. Many of the people that were in that barbershop are not happy about what they saw. Some of them might be reluctant to acknowledge what they saw. So you're going to hear witnesses,

> some of whom are going to acknowledge exactly
> what they saw to the best of their ability. Some of
> them you might expect to have seen more or seen
> something, and they say they didn't see something.
> I'll leave it to you to consider what the basis for that
> is, but keep it in mind. Witnesses are humans and
> they make mistakes. If there's discrepancies in their
> testimony, and I don't know if there will be, you
> have to decide is it something that matters or is it
> something that is not that big a deal. That's your job
> as jurors and I know you'll do a good job at it.

The judge denied defendants' motions for a mistrial. None of the defendants asked for a curative instruction.

The court conducted a Rule 104 hearing before Thomas testified. In his initial statement given to authorities in April 2007, Thomas claimed he did not see the shooting. In a later statement given just before trial, Thomas told investigators that Baker fired the fatal shots. Thomas explained that his parents' home and car had been sprayed with gunfire while his brother, who resembled him, was outside. Thomas believed that his initial refusal to identify defendants would keep his family safe from retaliation, but "it still happened". The prosecutor explained to Thomas that he could tell the jury he was afraid, but he could not specifically reference any incidents of retaliation. The judge approved and found that Thomas fully understood this limitation.

On cross-examination in front of the jury, Baker's attorney cross-examined Thomas about his inconsistent statements:

> Q: [Y]ou didn't tell [the police] about seeing the
> actual shooter because you thought that you'd be
> protecting yourself and your family, correct?
> . . . .
>
> A: Yes, I thought that . . . if I would have said that
> then I thought retaliation would[ ] be taken against
> my family.

. . . .

Q: You also said that . . . you didn't tell the police about seeing the actual shooting because you thought they'd go easier on you; isn't that a fact? Isn't that what you said?

A: On my family. I thought no retaliation would be taken against my family. You know what I'm saying?

. . . .

It wasn't . . . the prosecution going easy. I wasn't worried about that. Like I said, I was worrying about retaliation against my family. I got four sisters, like I said. I got kids. You know what I'm saying? And like I said, that shit already happened. I'm sorry. Like, the retaliation already happened.

Defendants moved for a mistrial. The prosecutor argued that Baker opened the door for the testimony, or invited the error, by repeatedly questioning Thomas on the inconsistency in his statements. The judge denied the requests for a mistrial, deciding instead to strike Thomas's response from the record. He informed the jury:

The Court will be striking the witness'[s] last response on the record. And the Court will indicate that there is no evidence that these defendants are involved in any retaliation against this witness. And [that] should not be considered whatsoever in this trial. And that's the Court's ruling.

The Court's recent statements in *State v. Yough*, 208 N.J. 385, 397–98 (2011), guide our review:

Whether testimony or a comment by counsel is prejudicial and whether a prejudicial remark can be neutralized through a curative instruction or

33

undermines the fairness of a trial are matters "peculiarly within the competence of the trial judge." [*State v. Winter*, 96 N.J. 640, 646–47 (1984)]. The grant of a mistrial is an extraordinary remedy to be exercised only when necessary "to prevent an obvious failure of justice." *State v. Harvey*, 151 N.J. 117, 205 (1997). For that reason, an appellate court should not reverse a trial court's denial of a mistrial motion absent a "clear showing" that "the defendant suffered actual harm" or that the court otherwise "abused its discretion." *State v. LaBrutto*, 114 N.J. 187, 207 (1989). Furthermore, when inadmissible evidence erroneously comes before the jury, an appellate court should not order a new trial unless the error was "clearly capable of producing an unjust result." *See* R. 2:10–2; *State v. Frisby*, 174 N.J. 583, 591 (2002).

Applying these standards to the facts at hand, it is clear that reversal is not warranted.

We find nothing in the prosecutor's opening remarks that requires reversal. Even if the comments were improper, they were brief, multiple openings by defense counsel followed, the trial was quite lengthy, and the judge's final instructions reminded the jurors that any comments by the attorneys were not evidence. *See State v. Echols*, 199 N.J. 344, 361 (2009) (concluding prosecutor's comments did not require reversal for similar reasons). . . .

As to Thomas's testimony, the judge gave an immediate and clear instruction to the jury, which we presume it followed. *State v. Winder*, 200 N.J. 231, 256 (2009). In his final charge, the judge reminded the jury not to consider any evidence he had stricken from the record. The trial judge's denial of defendants' mistrial requests was not a mistaken exercise of his discretion.

[Petitioner] also argues that the jurors could have connected Thomas's testimony with the court's dismissal of juror

number sixteen two weeks earlier during trial. Juror sixteen was dismissed following his admission that he read a newspaper article about a shooting in Lakewood where the victim was the mother of a witness's girlfriend. However, while the other jurors were aware that juror sixteen had violated the court's prohibition against reading newspapers during the trial, he testified that he did not reveal the contents of the article to the other jurors, and there is no evidence to support [Petitioner's] contention that the jurors would have connected Thomas's testimony with the juror's dismissal, particularly because the testimony lacked any reference to recent events.

Lastly, [Petitioner] and Scott argue that the cumulative effect of the prosecutor's comments and Thomas's testimony required a mistrial. In between the prosecutor's opening statement and Thomas's testimony, the jury heard defendants' three opening statements and the testimony of numerous witnesses. The brevity of each statement, in conjunction with the extensive time between them, makes it unlikely the jury connected the two.

*Russell*, 2012 WL 1365970 at \*10-12.

Pursuant to Supreme Court precedent, trial judges have broad discretion in deciding whether to grant a mistrial, and "may declare a mistrial whenever, in their opinion, taking all the circumstances into consideration, there is a 'manifest necessity' for doing so, [ ] but the power ought to be with the greatest caution, under urgent circumstances, and for very plain and obvious causes." *Renico v. Lett*, 559 U.S. 766, 773–74 (2010). There are no hard and fast rules regarding what conditions constitute a "manifest necessity" requiring a mistrial; rather, the determination must be based on the particular facts and circumstances of the case. *Russo v. Superior Ct.*

*of New Jersey*, 483 F.2d 7, 13 (3d Cir.1973); *Crawford v. Fenton*, 646 F.2d 810, 817 (3d Cir.1981).

The Appellate Division explained that in New Jersey, the grant of a mistrial is an extraordinary remedy to be exercised only when necessary "to prevent an obvious failure of justice." *Harvey*, 151 N.J. at 205. The standard applied by the Appellate Division is not contrary to clearly established federal law. *See Williams*, 529 U.S. at 406, 120 S.Ct. 1495 ("[A] run-of-the-mill state-court decision applying the correct legal rule from [Supreme Court] cases to the facts of a prisoner's case [does] not fit comfortably within § 2254(d)(1)'s 'contrary to' clause").

As for the court's inquiry under the "unreasonable application" prong of § 2254(d)(1), on habeas review

> [the] question is not whether the trial judge should have declared a mistrial. It is not even whether it was abuse of discretion for her to have done so . . . The question under AEDPA instead is whether the determination of the [state court] that there was no abuse of discretion was an "unreasonable application of . . . clearly established law."

*Renico*, 559 U.S. at 772–72. An improper witness statement only rises to the level of a due process violation if, when viewed in the context of the entire trial, the statement is of sufficient significance so as to deny the petitioner of a fair trial because it prevented the jury from arriving at a fair and impartial verdict. *See Greer v. Miller*, 483 U.S. 756, 765 (1987) (applied in the context of prosecutorial misconduct); *Arizona v. Washington*, 434 U.S. 497, 511–12 (1978). The Third

36

Circuit has identified three factors for a reviewing court to consider when determining if a trial court abused its discretion in denying a mistrial: (1) whether the witness' remarks were pronounced and persistent, creating a likelihood of misleading and prejudicing the jury; (2) the strength of the other evidence; and (3) the curative action taken by the court. *United States v. Xavier*, 2 F.3d 1281, 1285 (3d Cir.1993).

Upon review of the prosecutor's entire summation and in light of the trial evidence, the Court finds the prosecutor's comments that "some of [the witnesses] you might expect to have seen more or seen something, and they say they didn't see something. I'll leave it to you to consider what the basis for that is, but keep it in mind" were not so prejudicial as to deny Petitioner of due process. The Appellate Division reasonably applied the correct due process analysis and found that even if the comments were improper, the prosecutor's brief comments were made before three defense opening statements and a lengthy trial and the judge's final instructions reminded the jurors that any comments by the attorneys were not evidence which was sufficient to mitigate any prejudicial effect.

After reviewing Thomas' comments regarding his concern of retaliation, the Appellate Division's decision does not warrant habeas relief. As the Appellate Division explained, the trial court immediately gave the jury a curative instruction. At the close of trial, the trial court reminded the jury not to consider any evidence

that had been stricken from the record. The Appellate Division's finding that the trial court's prompt curative instruction was sufficient to cure the potential for prejudice resulting from Thomas' comment is consistent with Supreme Court precedent that juries are presumed to follow the instructions given by the trial court. *See Richardson v. Marsh*, 481 U.S. 200, 206–07 (1987) (collecting cases where the Supreme Court has presumed that a jury would follow its instructions to disregard evidence or use evidence for a limited purpose).

Finally, the Appellate Division found no merit to Petitioner's argument regarding the removal of juror number 16. The Appellate Division explained that the juror testified that he did not reveal the contents of the article to the other jurors. Petitioner has not supported his argument that the jurors would have somehow connected Thomas' testimony regarding retaliation with the juror's dismissal. Taking all of the circumstances into consideration, there is a not a "manifest necessity" requiring the grant of a mistrial based on the removal of juror number 16. *Renico*, 559 U.S. at 773-74. Reviewing Petitioner's arguments considering that above summarized circumstances, the Appellate Division applied clearly established federal law in holding that the trial court did not abuse its discretion in denying Petitioner's motions for a mistrial. As such, ground five is denied.

## F. Ground Six

In ground six, Petitioner argues that the misconduct of co-defendant Baker's defense counsel denied Petitioner a fair trial. (ECF No. 8 at 17-18.) Petitioner claims that "the antics of Baker's counsel extended well beyond the limits of zealous representation and could well be characterized as abuse of fact witnesses, which gives rise to the possibility that the jury's verdict against Petitioner [] was as much a product of the jury's revulsion at Baker's counsel's performance as of the evidence." (*Id.* at 17.) Petitioner claims that Baker's counsel was argumentative and demeaning toward the fact witnesses and persisted in mis-characterizing witness testimony and repeating questions to the witnesses. (*Id.*)

The Appellate Division found this argument lacked sufficient merit to warrant discussion in the court's opinion. *Russell*, 2012 WL 1365970 at *12-13. The Appellate Division added the following:

> As to allegations of Baker's counsel's misconduct, we note that no objection was made below, and, indeed, both co-counsel frequently joined in motions and applications made by Baker's counsel that now form the bases for allegations of misconduct. In any event, our review of the record convinces us that Baker's counsel's conduct did not divert the jury from its obligation to fairly consider the evidence against each defendant, something that the judge emphasized in his final instructions.

*Id.* at 13.

The Supreme Court has explained that the writ of habeas corpus "is a bulwark against convictions that violate 'fundamental fairness.'" *Engle v. Isaac*, 456 U.S.

107, 126 (1982), citing *Wainwright v. Sykes*, 433 U.S. 72, 97 (1977) (Stevens, J., concurring). The record does not support a finding that Petitioner was denied fundamental fairness at trial. As explained at length above, there was significant evidence introduced against Petitioner. Additionally, as noted by the Appellate Division, the trial judge instructed the jury that it must consider the evidence against each defendant. Petitioner has offered no evidence to show that the jury was diverted from their obligation to fairly consider the evidence. Thus, Petitioner has not shown, as required by 28 U.S.C. § 2254(d), that the state court determinations have "resulted in a decision that was contrary to, or involved an unreasonable application of clearly established Federal law, as determined by the Supreme Court of the United States." Nor has petitioner demonstrated that the state court rulings "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d). Accordingly, Ground Six is denied.

## G.  Ground Seven

Petitioner's seventh ground for habeas relief argues that the trial court properly granted his motion precluding the use of his street name, Gotti, at trial and that Appellate Division erred in reversing that decision on interlocutory review. (ECF No. 8 at 19.)

Petitioner raised this claim on direct appeal and the Appellate Division ruled as follows:

> In his written decision on defendants' pre-trial motions in limine to bar the use of street names, the judge concluded that "[t]he nicknames 'Gotti' and 'Pop–Off' amount[ed] to pejorative nicknames that should be kept from the jury . . . while the nicknames 'Respect', 'High–Five' and 'Hefe' do not constitute pejorative nicknames but should still be kept from the jury. . . ." The judge further observed that nicknames "are commonly used by gangs" and "could lead [the jury] to conclude that the defendants are guilty for the simple reason that if you have a street name you are affiliated with a gang and therefore have a tendency to commit violent acts."
>
> After granting the State's motion for interlocutory review, a panel of our colleagues concurred with the judge's conclusions that the names "Gotti" and "Pop–Off" "have sinister connotations," that "Respect" could, depending on context, but "Hefe" and "High–Five" were not pejorative. Nevertheless, the panel explained, "[a]lthough we recognize that prejudice may arise from the use of nicknames with sinister connotations, we cannot endorse the confounding of the State's presentation of evidence by requiring redaction of these nicknames from statements, audiotapes and testimony", "particularly in those circumstances where it is alleged the witness only knew a particular defendant by a particular nickname."
>
> On the first day of trial, the court provided the following instruction, to which all counsel agreed, to the jury:
>
>> Before I ask the State to call their first witness, ladies and gentlemen of the jury, throughout this trial you will hear references to nicknames allegedly possessed by the defendants, the victim, and witnesses in regards to identification evidence. These nicknames do not constitute evidence of guilt or propensity to engage in criminal conduct.

> All defendants contend that our colleagues erred in reversing the trial judge's decision to bar the use of street names.
>
> In *State v. Vujosevic*, 198 N.J.Super. 435, 447 (App.Div.), certif. denied, 101 N.J. 247 (1985), we held that where "the application for leave to appeal allowed us to consider the merits of the appeal on the papers submitted . . . [and] defendant was free to present any argument in support of the result reached in the trial court," our earlier decision is considered law of the case in future appeals. *Accord State v. Myers*, 239 N.J.Super. 158, 164 (App.Div.), certif. denied, 127 N.J. 323 (1990). Defendants concede that the law of the case doctrine applies. Nonetheless, they have raised the argument to preserve their right to seek further review by the Supreme Court.
>
> Parenthetically, we fully agree with the decision reached by our colleagues and the argument provides no basis for reversal.

*Russell*, 2012 WL 1365970 at *9.

To show that an evidentiary error rose to the level of a due process violation, a petitioner must show the error was "of such magnitude as to undermine the fundamental fairness of the entire trial." *Keller v. Larkins*, 251 F.3d 408, 413 (3d Cir. 2001) (citing *McCandless v. Vaughn*, 172 F.3d 255, 262 (3d Cir.1999) and *Lesko v. Owens*, 881 F.2d 44, 51–52 (3d Cir.1989)). Ultimately, Petitioner cannot show he was prejudiced by the use of his alias at trial. Upon examination of the trial record, it is clear that Petitioner's alias was used through a significant portion of the state's evidence and some witnesses only knew the defendants by their alias. Additionally, the trial court instructed the jury that the nicknames do not constitute

42

evidence of guilt or propensity to engage in criminal conduct. As explained above, the Supreme Court precedent is that juries are presumed to follow the instructions given by the trial court. *See Richardson*, 481 U.S. 206–07.

On habeas review, to prove a state court's decision involved an unreasonable application of clearly established federal law, "a petitioner must persuade a federal court that no "fairminded juris[t]" could reach the state court's conclusion under [the Supreme] Court's precedents." *Brown v. Davenport*, 142 S. Ct. 1510, 1525 (2022) (quoting *Davis v. Ayala*, 576 U.S. 257, 269 (2015) (first alteration in original, internal quotation marks omitted in original). In this case, a fairminded jurist could agree with the Appellate Division's determination, and that is sufficient to deny the habeas claim. When the trial court's limiting instruction is taken into account, and presumably followed by the jury, use of Petitioner's alias did not so infect the entire trial with unfairness as to violate due process. Therefore, Ground Seven for habeas relief is denied.

## H.  Ground Eight

In Ground Eight, Petitioner argues the trial court improperly denied his motion for a new trial. (ECF No. 8 at 20.) Petitioner argues that based on the following the trial court erred in not granting a new trial: (1) the prosecutor's improper comments in opening statements; (2) the prosecutor's improper challenge of an African-American juror; (3) the improper testimony from Granados; (4) the

43

belated statement changes from Thomas, Granados, and Truyunque; (5) Thomas' testimony that others made identifications; (6) Thomas' statement regarding retaliation; (7) the trial court's failure to permit the defense to call a witness from Sprint Wireless; and (8) the verdict was against the weight of the evidence. (*Id.*)

"Cumulative errors are not harmless if they had a substantial and injurious effect or influence in determining the jury's verdict, which means that a habeas petitioner is not entitled to relief based on cumulative errors unless he can establish 'actual prejudice.'" *Albrecht v. Horn*, 485 F.3d 103, 139 (3d Cir. 2007) (quoting *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993)). The issues raised by Petitioner in this ground for relief, were addressed by this Court in grounds two, three, four, and five above.[5] The Court has reviewed the Appellate Division's resolution of grounds two through five with the appropriate AEDPA deference and concluded its resolution was not contrary to or an unreasonable application of federal law. The decision was also reasonable based on the facts at trial. "Petitioner has (i) failed to cast doubt over the proofs of his guilt, and (ii) failed to establish that he has suffered

---

[5] Petitioner's allegation that the trial court erred in not allowing the defense to call a witness from Sprint Wireless was not raised above. However, Petitioner offers no factual or legal support for this argument. A petition must "specify all the grounds for relief" and set forth "facts supporting each of the grounds thus specified." 28 U.S.C. § 2254 Rule 2(c) (amended Dec. 1, 2004). Petitions which provide no more than "vague and conclusory grounds for habeas relief are subject to summary dismissal" under the rule. *Anderson v. Pennsylvania Attorney General*, 82 F. App'x 745, 749 (3d Cir. 2003); *see also United States v. Thomas*, 221 F.3d 430, 437 (3d Cir. 2000); *United States v. Dawson*, 857 F.2d 923, 928 (3d Cir. 1988). Therefore, the Court will summarily dismiss this portion of Ground Eight.

any prejudice from the purported errors. Thus, Petitioner has not proven that the alleged cumulative errors had 'a substantial and injurious effect or influence in determining the jury's verdict.'" *Thomas v. Johnson*, No. 18-0710, 2022 WL 603002, at *28 (D.N.J. Mar. 1, 2022) (quoting *Fahy v. Horn*, 516 F.3d 169, 205 (3d Cir. 2008)); *Thomas v. Adm'r New Jersey State Prison*, No. 22-1540, 2022 WL 4363552 (3d Cir. Aug. 30, 2022). The Court denies habeas relief on this ground.

## I. Ground Nine

In Ground Nine, Petitioner asserts a standalone cumulative error claim, arguing the cumulative prejudicial effect of grounds one through eight above should require the Court to grant his habeas petition. (ECF No. 8 at 21.)

As explained above, The Third Circuit has recognized that cumulative error may be a basis for habeas relief, holding:

> Individual errors that do not entitle a petitioner to relief may do so when combined, if cumulatively the prejudice resulting from them undermined the fundamental fairness of his trial and denied him his constitutional right to due process. "Cumulative errors are not harmless if they had a substantial and injurious effect or influence in determining the jury's verdict, which means that a habeas petitioner is not entitled to relief based on cumulative errors unless he can establish 'actual prejudice.'"

*Fahy*, 516 F.3d at 205 (quoting *Albrecht*, 471 F.3d at 468). As explained, the Appellate Division's decisions on Petitioner's above discussed claims were not contrary to or an unreasonable application of federal law. As a result, they provide

no errors to aggregate. Even assuming arguendo there was some prejudice in any of the above discussed claims, in light of the above summarized evidence of Petitioner's guilt presented at trial, the Court is not persuaded the any possible cumulative prejudice resulting from Petitioner's allegations of errors is sufficient to undermine the fundamental fairness of the trial in this case so as to constitute a denial of Petitioner's constitutional right to due process. Relief on this claim will therefore be denied.

### J. Ground Ten

Petitioner argues in Ground Ten that the trial court's decision to provide transcripts to the jury, who requested them, rather than to conduct a readback of testimony in open court, denied him a fair trial. (ECF No. 8 at 22.) Petitioner admits that the jury requested transcripts of the testimonies of Granados, Silva, Paul Miller, Thomas, Vega, and Truyunque. (*Id.*) However, he alleges that the trial court should have could have conducted a readback of the testimonies. (*Id.*)

The Appellate Division denied this claim on direct appeal, finding as follows:

> During the first day of deliberations, the jury requested transcripts of the testimony of Silva, Granados, Miller and Thomas. After confirming that the jury wanted transcripts of the entire testimony, and redacting some of Thomas's testimony based on his prior rulings, the judge provided the transcripts to the jury. Defendants lodged a minor objection to a portion of Thomas's testimony but did not object to the procedure.

All three defendants now contend that their right to a fair trial was violated because the jury was allowed to review the transcripts in the jury room and outside defendants' presence. We review the argument utilizing the plain error standard. R. 2:10–2.

In *State v. Brown*, 362 N.J.Super. 180, 181 (App.Div.2003), the jurors requested a readback of the victim's testimony. The judge directed the court reporter to read back the testimony to the jurors in the jury room, permitting the prosecutor and defense counsel, but not the defendant, to be present. *Id.* at 184. In reversing defendant's conviction, we held that '"criminal defendants have the right to be present at all critical stages of the trial,'" including the readback of testimony. *Id.* at 188.

Defendants equate the jury's review of transcripts in this case with the readback of testimony in *Brown*. However, in *Brown*, we noted '"[s]everal pitfalls'" in the judge's procedure, including her ex parte, off-the-record communications with the jury, her decision to allow note-taking despite an earlier instruction that it was prohibited, and the judge's failure to record the readback. *Id.* at 185–87. Finally, we noted that '"[d]uring the course of readbacks, events commonly occur which require the presence of a presiding judge.'" *Id.* at 187. This case presented no such concerns because the jury was presented solely with the trial transcripts already reviewed and redacted by the judge and the attorneys.

Although no reported New Jersey case has addressed this issue squarely, several federal cases have held that providing the jury with transcripts of trial testimony does not constitute an abuse of discretion. *See U.S. v. Bertoli*, 40 F.3d 1384, 1399–1401 (3rd Cir.1994); *U.S. v. Lujan*, 936 F.2d 406, 411–12 (9th Cir .1991); *U.S. v. Betancourt*, 838 F.2d 168, 175 (6th Cir.) ('"the furnishing of transcripts to a jury is generally well within the district court's discretion"'), cert. denied, 486 U.S. 1013, 108 S.Ct. 1748, 100 L. Ed.2d 210 (1988).

> We recognize that these cases do not address the issue in the context of a defendant's right to be present at all critical stages of the trial. *See Brown*, *supra*, 362 N.J.Super. at 189. Nevertheless, as we noted in *Brown*, defendant's presence at the readback was required "'to assure that the procedure [was] correctly conducted.'" *Ibid.* In this case, defendants were presented with an adequate opportunity to urge the redaction of certain portions of the transcripts, actively participated in and assented to a procedure that required no further monitoring by the judge and counsel. We find no basis for reversal.

*Russell*, 2012 WL 1365970 at *14-15.

While this claim appears to present matters purely of state law, to the extent this Court can construe it as a federal claim, the court's error, if any, is harmless. Under the harmless error standard, a petitioner will not be entitled to habeas relief unless s/he has demonstrated "'actual prejudice,' in the form of a substantial and injurious effect or influence in determining the jury's verdict." *Eley*, 712 F.3d at 847 (citing *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993)). As noted by the Appellate Division, the Third Circuit has held that providing the jury with transcripts of trial testimony does not constitute an abuse of discretion. *See Bertoli*, 40 F.3d at1399–1401. Petitioner has not articulated any actual prejudice from the trial judge presenting the jury with the transcripts of the witnesses, rather than performing a readback. The jury had already heard testimony from these witnesses, such that the transcript provided nothing new. Additionally, the trial court provided Petitioner with an opportunity to review the transcripts and request redactions. Because

Petitioner has failed to demonstrate substantial harm from the alleged error, the state court did not violate clearly established federal law in denying this claim. Therefore, the Court denies habeas relief on this claim.

### K. Grounds Eleven and Twelve

In Grounds Eleven and Twelve, Petitioner argues that evidence obtained post-trial reveals that the trial judge, Judge Daniels, was the prosecutor in numerous cases in which co-defendant Baker was named as a defendant and, therefore, Petitioner's conviction must be vacated. (ECF No. 8 at 23-25.)

Petitioner raised this argument on collateral review, and the PCR court denied the claim as follows:

> In regard to Defendants Russell and Scott vis-a-vis the alleged conflict with Baker and Judge Daniels, both lack standing to challenge the constitutionality of Judge Daniels sitting as judge.
>
> As noted above, the case of *State v. Presley*, 436 N.J. Super. 440 (App. Div. 2014) is instructive. There, the Appellate Division held that the standing principles of search and seizure challenges should guide a trial judge in determining if a potential conflict should extend to other defendants. The Court noted that a challenge may be made "only by those whose rights were violated by the search itself, not by those who are aggrieved solely by the introduction of damaging evidence." *Id.* at 453.
>
> The Appellate Division in *Presley* concluded that a "parallel standard" should apply to disqualification and that in the absence of a constitutional defect "a judge with a disqualifying conflict as to one defendant is an insufficient basis for the other defendants to seek the nullification of

orders entered by the judge and the additional relief sought."
*Id.* at 453.

. . . [Petitioner] and Scott would fail pursuant to the holding
in the *Presley* case.

(ECF No. 27-6 at 32-33.) The Appellate Division affirmed the decision of the PCR

court. *Russell*, 2019 WL 2114762 at *11-12. The Appellate Division noted that the

trial judge's interrogatory answers stated he "did not have any recollection of having

previously prosecuted [Baker] while [he] was an assistant prosecutor." *Id.* at *7. The

Appellate Division ruled as follows:

> We next address [Petitioner's] contention that the PCR court
> erred by rejecting his claim that his conviction and sentence
> must be set aside because the trial judge was disqualified from
> hearing the case due to his prior prosecution of Baker as a
> juvenile . . . We disagree.
>
> [Petitioner] argue[s] the PCR court erred by employing the
> standards adopted in *Presley*, 436 N.J. Super. at 463, to
> determine if the trial court's conflicts with Baker [] violated
> [Petitioner's] constitutional right to a fair trial. In *Presley*, we
> determined the following non-exclusive list of factors were
> relevant to the analysis of challenges to searches and seizures
> on constitutional grounds:
>
>> (1) the nature and extent of the judge's prior role as
>> a prosecutor or attorney and the amount of time that
>> passed since the disqualifying conduct;
>> (2) the facts known to the judge at the time of the
>> judicial act that is challenged;
>> (3) the reasonableness of efforts made by the State
>> and the judge to identify a conflict before judicial
>> action is taken;

(4) the evidence of actual partiality on the part of
the judge, including any evidence that his or her
prior role affected the decision made;
(5) the length of delay in raising the issue and any
reason for such delay;
(6) prejudice to the adverse party caused by the
delay in raising the disqualification issue; [and]
(7) sufficiency of support for the warrant or order
issued by the judge.

[*Ibid.* (footnote omitted).]

We explained no one factor is dispositive and "our analysis is
informed by whether the nullification of orders and the
suppression of evidence will serve the objective of the Code
of Judicial Conduct 'to maintain public confidence in the
integrity of the judiciary.'" *Ibid.* (quoting In re Advisory
Letter No. 7-11 of the Supreme Court Advisory Comm., 213
N.J. 63, 71 (2013)).

While we are mindful that *Presley* involved search warrants
issued by a judge who subsequently recused himself because
he had previously prosecuted one of the defendants as an
assistant prosecutor some seven years earlier, 436 N.J. Super.
at 443-44, we discern no error by the trial court in utilizing
the *Presley* factors as part of its analysis. As in *Presley*, many
years had passed since the trial judge's prosecution of Baker,
the conflict with Baker was first raised long after the
proceedings in question, the judge did not recall his prior
prosecution of Baker, and the prior prosecution of Baker did
not involve [Petitioner] or the other co-defendants.

Taking into account the totality of the circumstances, we
conclude [Petitioner] did not demonstrate actual bias or
prejudice to him or his co-defendants. The trial judge's
prosecution of Baker as a juvenile would not cause a
reasonable, informed person to have doubts about the judge's
impartiality. We are likewise satisfied [Petitioner's] right to a
fair trial was not violated. Accordingly, the undisclosed Baker
conflict does not establish a prima facie case for PCR.

*Id.* at *10-12.

Petitioner fails to demonstrate that the Appellate Division's determination was contrary to, or an unreasonable application of, clearly established federal law. *See* 28 U.S.C. § 2254(d)(1). The Appellate Division's decision was consistent with federal law. The Supreme Court has found that "recusal is required when, objectively speaking, 'the probability of actual bias on the part of the judge or decisionmaker is too high to be constitutionally tolerable.'" *Rippo v. Baker*, 580 U.S. 285, 287 (2917), quoting *Withrow v. Larkin*, 421 U.S. 35, 47 (1975). Petitioner offers no facts that would show bias by the trial judge against Petitioner. The trial judge's interrogatory answer stated that he did not have any recollection of having previously prosecuted Baker while he was an assistant prosecutor. Petitioner's allegation does not meet the standard of showing the risk of bias "too high to be constitutionally tolerable." *Rippo*, 580 U.S. at 287. The Appellate Divisions' decision was not an unreasonable application of federal law as determined by the Supreme Court. As such, habeas relief is denied as to Grounds Eleven and Twelve.

**L. Ground Thirteen, Fourteen, Fifteen, Sixteen, and Seventeen**

Grounds Thirteen through Seventeen all raise claims of ineffective assistance of trial and appellate counsel. (ECF No. 8 at 26-36.) Petitioner alleges the following grounds for relief:

> Ground Thirteen: Trial [counsel] was ineffective for failing to produce a witness [Tyleek Baker] who could have exculpated Petitioner;
>
> Ground Fourteen: [Trial counsel] was ineffective because he did not ask the state's star witness [Daniel Thomas] to inform the jury [Petitioner] was not involved in a conspiracy to commit a homicide;
>
> Ground Fifteen, subclaims A and B
>
> A. [Trial counsel] and [appellate counsel] failed to challenge the trial court's faulty [jury] instruction on [Petitioner's] "street name";
>
> B. [Trial counsel] and [appellate counsel] failed to object to a part of the trial court's charge that misstated the evidence and improperly reduced the state's burden of proof;
>
> Ground Sixteen, subclaims A and B
>
> A. [Trial counsel] and [appellate counsel] neglected to contest the prosecution's allegations that the defendants engaged in a campaign of terror;
>
> B. [Trial counsel] should have objected to the prosecutor's comments that were not based upon evidence in the record and which broached a prohibited subject;
>
> Ground Seventeen: [Trial counsel] failed to make sure the prosecutor adhere to the Appellate Division's parameters for comments on the street name "Gotti."

(*Id.*)

The Sixth Amendment, applicable to states through the Due Process Clause of the Fourteenth Amendment, guarantees the accused the "right . . . to have the Assistance of Counsel for his defense." U.S. Const. amend. VI.  The right to counsel is the right to the effective assistance of counsel, and counsel can deprive a defendant of the right by failing to render adequate legal assistance.  *See Strickland v. Washington*, 466 U.S. 668, 686 (1984).

A claim that counsel's assistance was so defective as to require reversal of a conviction has two components, both of which must be satisfied.  *See Strickland*, 466 U.S. at 687.  To establish an ineffective assistance of counsel claim, a petitioner must first prove "counsel's representation fell below an objective standard of reasonableness."  *Id.* at 688.  In analyzing counsel's performance, the court must be "highly deferential."  *Id.* at 689.  The Supreme Court explained:

> A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstance of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time.  Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'

*Id.* (*quoting Michel v. Louisiana*, 350 U.S. 91, 101 (1955)).  A convicted defendant asserting ineffective assistance must therefore identify the acts or omissions that are

54

alleged not to have been the result of reasoned professional judgment. *Strickland*, 466 U.S. at 690. The reviewing court then must determine whether, in light of all the circumstances, the identified acts or omissions were outside "the wide range of professionally competent assistance." *Id.* It follows that counsel cannot be ineffective for declining to raise a meritless issue. *See Premo v. Moore*, 562 U.S. 115, 124 (2011).

The second part of the *Strickland* test requires a petitioner to demonstrate that counsel's performance "prejudiced the defense" by depriving petitioner of "a fair trial, a trial whose result is reliable." 466 U.S. at 687. To establish prejudice, a petitioner must show "there is a reasonable probability that, but for counsel's unprofessional error, the result of the proceeding would have been different." *Id.* at 694.

If a petitioner fails to satisfy either prong of the *Strickland* test, it is unnecessary to evaluate the other prong, as a petitioner must prove both prongs to establish an ineffectiveness claim. *Id.* at 697. Moreover, "if it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice…that course should be followed." *Id.*

Because Petitioner's ineffective assistance of counsel claim is raised through a § 2254 petition, federal "review must be 'doubly deferential' in order to afford 'both the state court and the defense attorney the benefit of the doubt.'" *See Woods*,

575 U.S. at 316 (quoting *Burt v. Titlow*, 571 U.S. 12, 15 (2013)); *see also Pinholster*, 563 U.S. at 190 ("[R]eview of the [State] Supreme Court's decision is thus doubly deferential."); *see also Knowles v. Mirzayance*, 556 U.S. 111, 123 (2009) ("[D]oubly deferential judicial review applies to a *Strickland* claim evaluated under the § 2254(d)(1) standard . . . ."); *see also Yarborough v. Genrty*, 541 U.S. at 1, 6 (2003) ("Judicial review of a defense attorney . . . is therefore highly deferential--and doubly deferential when it is conducted through the lens of federal habeas."). Indeed, "[w]hen § 2254(d) applies, the question is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied *Strickland's* deferential standard." *See Harrington v. Richter*, 562 U.S.86, 105 (2011).

The relevant state court decision for federal habeas corpus review is the last reasoned state court decision. *See Bond v. Beard*, 539 F.3d 256, 289–90 (3d Cir. 2008). These deferential standards apply "even where there has been a summary denial" by the state court. *Cullen v. Pinholster*, 563 U.S. 170, 187 (2011).

Here, Petitioner raised his ineffective assistance of counsel claims on collateral appeal and the PCR court issued a lengthy and detailed opinion denying Petitioner's claims as meritless. (*See* ECF No. 27-6 at 35-43.) The PCR court noted that the same *Strickland* standard that applies to trial counsel ineffective assistance claims, applies to claims of ineffective assistance of appellate counsel in finding

those claims meritless. (*Id.* at 37-38.) Petitioner appealed and the Appellate division affirmed the PCR court's decision and denied the claims. *Russell*, 2019 WL 2114762 at *12. The Appellate Division is the last reasoned state court decision. The Appellate Division denied all of Petitioner's ineffective assistance of counsel claims, stating "[t]he PCR judge thoughtfully addressed each of [Petitioner's] arguments in her comprehensive written decision. After reviewing these arguments in light of the record and applicable legal principles, we conclude they are without merit. We affirm substantially for the reasons set forth in the PCR judge's comprehensive written decision." *Id.* at * 10. The Appellate Division added the following:

> Our review of the record reveals [Petitioner] has not established a prima facie case of ineffective assistance of counsel. He has not shown that his counsel's alleged errors caused the requisite prejudice. To establish prejudice, a defendant must show "a reasonable probability that, but for counsel's unprofessional errors," a different verdict would have resulted. [*State v. Fritz*, 105 N.J. 42, 52 (1987)] (quoting *Strickland*, 466 U.S. at 694). The impact of counsel's alleged errors on a verdict turns primarily on the strength of the evidence against the defendant and how counsel's errors relate to that evidence. Where the case against the defendant is strong, counsel's performance, unless egregiously lacking, will not result in a different outcome. *See State v. Pierre*, 223 N.J. 560, 583 (2015) ("Important to the prejudice analysis is the strength of the evidence that was before the fact-finder at trial.").
>
> The evidence against [Petitioner's] and his co-defendants was overwhelming. Applying these principles, [Petitioner] has failed to show a reasonable probability that, but for counsel's alleged errors, the jury would have reached a different verdict. Absent a showing of prejudice, [Petitioner] was unable to

> establish a prima facie case of ineffective assistance of counsel to warrant an evidentiary hearing or PCR. [*State v. Preciose*, 129 N.J. 451, 462 (1992)]; R. 3:22-10(b).

*Russell*, 2019 WL 2114762 at *12.

The PCR court and the Appellate Division's determinations were not contrary to nor an unreasonable application of the *Strickland* test. The Appellate Division found that Petitioner could not meet the prejudice prong of *Strickland* based on the overwhelming evidence against Petitioner.

The Court has extensively reviewed the record before it in this matter. Petitioner cannot show that but for the alleged ineffective assistance of trial and appellate counsel the outcome of Petitioner's trial and appeal would have been different. As explained above, Christian Vivar Granados testified that he saw Petitioner enter the barbershop with co-defendant Scott shortly before the murder, where he walked from the front to the back of the shop, and then exited the barbershop. (ECF No. 24-3 at 16:4 to 17:4.) Granados testified that he saw Petitioner reenter the barbershop a short time later with co-defendant Scott and co-defendant Baker. (*Id.* at 17:5-14.) Petitioner was then seen standing next to co-defendant Baker while Baker said, "where's that n***** that have a beef with me?" and started shooting at Jose Francisco Olivares. (*Id.* at 17:15 to 18:16.) Granados further testified that Petitioner stood next to co-defendant Baker expressionless, with a straight face, while Baker shot Olivares. (*Id.* at 18:21 to 19:20.) Daniel Thomas

testified at trial that after the shooting Petitioner drove co-defendants Baker and Scott to Freehold, New Jersey, and that Baker had attempted to get Thomas to take the murder weapon. (ECF No. 25 at 127:13 to 129:25.) Thomas testified that Petitioner told him that after leaving Freehold, Petitioner drove Baker to Baltimore. (*Id.* at 131:9-18.) Robert Schillaci testified that the day after the shooting Petitioner called him and asked him to trade in the rental car Petitioner was driving for a bigger car. (*Id.* at 10:2 to 10:25.)

To satisfy the second prong of the *Strickland* test, a petitioner must "show there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." 446 U.S. at 694. "'A reasonable probability is a probability sufficient to undermine confidence in the outcome' of the proceeding." *Id.* Considering the overwhelming evidence against Petitioner, Petitioner has failed to show that but for counsel's alleged ineffective assistance, the result of his trial and appeal would have been different. The state court's adjudication of Petitioner's ineffective assistance of counsel claims was not an unreasonable application of *Strickland*. As such, Grounds Thirteen through Seventeen are denied.

## V. MOTION TO EXPAND THE RECORD

Also before the Court is Petitioner's May 20, 2023, motion to expand the record. (ECF No. 41.) Petitioner motions for the Court to accept the documents attached to his motion as part of the record in this matter. (*Id.*) Those documents

consist of a copy of 1) the transcript of the trial court's evidentiary hearing on Petitioner's motion to suppress evidence from the vehicle searches based on a defective arrest warrant; 2) a declaration from Petitioner; 3) a *pro se* PCR form; and 3) a declaration from PCR counsel in which counsel admits to his ineffective assistance in failing to raise a claim that the "Ocean County Prosecutor's Office, through it detective and/or its attorneys, obtained an illegal warrant for his arrest." (*See* ECF Nos. 41-2, 41-5, 41-6, 41-9.)

The Court grants Petitioner's motion to expand and accepts these documents as part of the record.

It appears Petitioner requests to add these documents to the record to support a claim regarding an alleged defective arrest warrant. However, that claim was not raised in Petitioner's instant habeas petition and it therefore not before this Court.

On June 10, 2021, August 31, 2021, and December 16, 2022, Petitioner filed motions for stay and abeyance, seeking a stay to exhaust a claim that PCR counsel was ineffective for failing to raise a claim that the state's arrest warrant was defective. (*See* ECF Nos. 11, 13 and 32.) The Court denied all three motions for stay, concluding that Petitioner's second PCR petition in which he was attempting to exhaust his claim asserted an ineffective assistance of PCR counsel claim and a stay pursuant to *Rhines v. Weber*, 544 U.S. 269 (2005) was not appropriate because such a claim PCR counsel ineffective assistance is not cognizable in federal habeas

proceedings. (*See* ECF Nos. 12, 30 and 38, citing 28 U.S.C. § 2245(i); *Coleman v. Thompson*, 501 U.S. 722, 752 (1991)).

Although there is not claim regarding an alleged defective arrest warrant presently before the Court, the Court notes that a Fourth Amendment claims are not generally cognizable on habeas review. *See Stone v. Powell*, 428 U.S. 465, 482 (1976). In *Stone*, the Supreme Court held that, "where the State has provided an opportunity for full and fair litigation of a Fourth Amendment claim, a state prisoner may not be granted federal habeas corpus relief on the ground that evidence obtained in an unconstitutional search or seizure was introduced at trial." *Id.* This bar applies whether the claim is potentially meritorious or not. *See Deputy v. Taylor*, 19 F.3d 1485, 1491 (3d Cir. 1994). A petitioner is considered to have had a full and fair opportunity to litigate such claims if the state has an available mechanism for suppressing evidence seized in or tainted by an illegal search or seizure, irrespective of whether the petitioner actually availed himself of that mechanism. *See U.S. ex rel. Hickey v. Jeffes*, 571 F.2d 762, 766 (3d Cir. 1978); *Boyd v. Mintz*, 631 F.2d 247, 250 (3d Cir. 1980). Conversely, a petitioner has not had a full and fair opportunity to litigate a Fourth Amendment claim, and therefore avoids the *Stone* bar, if the state system contains a structural defect that prevented the state court from fully and fairly hearing the petitioner's Fourth Amendment argument. *See Marshall v. Hendricks*,

307 F.3d 36, 82 (3d Cir. 2002). Notably, "an erroneous or summary resolution by a state court of a Fourth Amendment claim does not overcome the [Stone] bar." *Id.*

Here, Petitioner has had a full and fair opportunity to litigate this claim. The trial court held a suppression hearing regarding the search of the vehicles Petitioner was driving and the allegedly defective arrest warrant. (*See* ECF No. 41-2.) Petitioner's allegations that appellate counsel failed to raise this claim on appeal does not amount to a structural error in the state system that would overcome some the *Stone* bar. Additionally, Petitioner's allegation that he was not provided with a copy of the suppression hearing transcript until recently would not be a structural error in the state system that prevented Petitioner from bringing his claim on appeal. Although, a claim of defective arrest warrant is not before the Court in Petitioner's habeas petition, it appears as though any such claim would be barred by *Stone*.

## VI.  CERTIFICATE OF APPEALABILITY

Pursuant to 28 U.S.C. § 2253(c), unless a circuit justice or judge issues a certificate of appealability, an appeal may not be taken from a final order in a proceeding under 28 U.S.C. § 2254. A certificate of appealability may issue "only if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). "A petitioner satisfies this standard by demonstrating that jurists of reason could disagree with the district court's resolution of his

constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further." *Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003).

Here, Petitioner has failed to make a substantial showing of the denial of a constitutional right. Thus, no certificate of appealability shall issue.

## VII. CONCLUSION

For the above reasons, the § 2254 habeas petition is denied, and a certificate of appealability will not issue. An appropriate Order follows.

Dated: September 14, 2023

s/*Peter G. Sheridan*
PETER G. SHERIDAN, U.S.D.J.